EILEEN B. GOLDSMITH (SBN 218029)
ZOE PALITZ (SBN 275752)
SAMUEL HULL (SBN 345265)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
E-mail: egoldsmith@altber.com
zpalitz@altber.com
shull@altber.com

*Attorneys for Plaintiff International Union of Operating Engineers Local 3*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 3,<br><br>Plaintiff,<br><br>v.<br><br>MARATHON PETROLEUM COMPANY, LP and TESORO REFINING AND MARKETING LLC,<br><br>Defendants. | CASE NO. 3:22-cv-09057-AGT<br><br>**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: May 12, 2023<br>Time: 10:00 a.m.<br>Courtroom: A, 15th Floor<br>Judge: Hon. Alex G. Tse<br><br>Complaint Filed: December 19, 2022<br>Trial Date: Not Yet Set |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................ii

I. The Plain Language of the Contract Subjects Defendants to the Grievance Procedure................2

II. Defendants Ask the Court to Resolve Issues Reserved for the Arbitrator ....................................7

CONCLUSION ..............................................................................................................................11

## TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Am. Fed'n of Musicians v. Paramount Pictures Corp.*,
 903 F.3d 968 (9th Cir. 2018) ................................................................................. 2, 6, 7

*Atkinson v. Sinclair Ref. Co.*,
 370 U.S. 238 (1962) .......................................................................................................... 3

*U.S. ex rel. Barajas v. United States*,
 258 F.3d 1004 (9th Cir. 2001) ........................................................................................ 3

*Boys Mkts., Inc. v. Retail Clerks Union Local 770*,
 398 U.S. 235 (1970) .......................................................................................................... 5

*Children's Hosp. Med. Ctr. v. Cal. Nurses Ass'n.*,
 283 F.3d 1188 (9th Cir. 2002) ........................................................................................ 5

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
 561 U.S. 287 (2010) ........................................................................................................ 10

*Headlands Rsrv., LLC v. Ctr. For Nat. Lands Mgmt.*,
 523 F.Supp.2d 1113 (C.D. Cal. 2007) ........................................................................... 7

*Int'l Longshore & Warehouse Union v. NLRB*,
 978 F.3d 625 (9th Cir. 2020) ..................................................................................... 2, 6

*Laborers Int'l Union Local 252 v. Town Concrete Pipe of Wash., Inc.*,
 680 F.2d 1284 (9th Cir.), *cert. denied*, 459 U.S. 1039 (1982) ................................. 8

*Northern California Newspaper Guild Local 52 v. Sacramento Union*,
 856 F.2d 1381 (9th Cir. 1988) .................................................................................. 9, 10

*Orr v. Bank of Am.*,
 285 F.3d 764 (9th Cir. 2002) .......................................................................................... 7

*United Food & Com. Workers Union, Loc. 770 v. Geldin Meat Co.*,
 13 F.3d 1365 (9th Cir. 1994) ..................................................................................... 8, 10

*United States v. Bennett*,
 363 F.3d 947 (9th Cir. 2004) .......................................................................................... 7

*United Steelworkers v. Am. Mfg. Co.*,
 363 U.S. 564 (1960) ........................................................................................................ 10

*United Steelworkers v. Warrior & Gulf Navigation Co.*,
 363 U.S. 574 (1960) ........................................................................................... 2, 8, 10, 11

*Westinghouse Hanford Co. v. Hanford Atomic Metal Trades Council*,
   940 F.2d 513 (9th Cir. 1991) .......................................................................................... 8

*Winery, Distillery & Allied Workers Union, Local 186 v. E & J Gallo Winery, Inc.*,
   857 F.2d 1353 (9th Cir. 1988) ................................................................................. 8, 10

**Other Authorities**

Fed. R. Civ. P. 56(c) ............................................................................................................ 7

International Union of Operating Engineers, Local 3's grievance concerns whether Defendants violated Article 3 of the Martinez refinery project labor agreement ("PLA") by subcontracting certain soils and materials inspection and testing and building/construction inspection to a non-union contractor that did not agree to become bound to the PLA. To resolve that grievance will require interpretation of Article 3's subcontracting terms, as well as Article 2 of the PLA, which defines "Covered Work," including exemptions from "Covered Work" that Defendants claim apply. Dkt. 25-1 ("PLA") §§2.3.5, 2.3.9; *see also* Dkt. 33 ("Opp.") at 12-13. Under the plain language of the PLA's grievance procedure, that interpretation must be made by a labor arbitrator, who is tasked with resolving "any question arising out of … this Agreement involving its interpretation and application." PLA §8.1.

Defendants' opposition fails to raise any genuine dispute of material fact regarding the application of the PLA's arbitration clause that would overcome the strong presumption in favor of arbitration of disputes arising under a collective bargaining agreement. The PLA unambiguously requires the Defendants, as the refinery Owner and a signatory Employer to the PLA, to participate in the grievance procedure when a grievance is filed against them. Defendants attempt to manufacture ambiguity in the PLA by including with their Opposition a declaration recounting some bargaining history, but the Court need not even consider that extrinsic evidence because the PLA is unambiguous. And even if the Court did consider it, the bargaining history Defendants provide is entirely consistent with the Union's reading that the PLA requires the Owner to arbitrate grievances brought against it due to its own subcontracting violations.

Defendants' other arguments are without merit and invite this Court to become needlessly entangled in the substance of the underlying grievance. Defendants' position that the grievance is not subject to arbitration because the work in question is not "Covered Work" *is* the ultimate question the arbitrator will have to decide — it requires interpretation of the work assignment provisions of Article 3, as well as Article 2's definition of "Covered Work" and the exclusions therefrom. Because none of Defendants' arguments raise a triable issue of fact, the Union's summary judgment motion should be granted, and Defendants should be compelled to arbitrate.

# I. The Plain Language of the Contract Subjects Defendants to the Grievance Procedure

It is well-established that "[a]n order to arbitrate [a] particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960). "In the absence of any express provision excluding a particular grievance from arbitration, … only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *Id.* at 584-85.

Under Ninth Circuit law, a collective bargaining agreement, such as the PLA, must be interpreted "'according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy.'" *Am. Fed'n of Musicians v. Paramount Pictures Corp.*, 903 F.3d 968, 977 (9th Cir. 2018) (quoting *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015)). "'Where the words of a contract … are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.'" *Id.* (quoting *M&G Polymers*, 574 U.S. at 435). The Court must "interpret written terms in the context of the entire agreement's language, structure, and stated purpose," and a contract term may be found ambiguous "only if multiple reasonable interpretations exist." *Id.* (citations omitted). Only if a contract term is ambiguous may the Court resort to extrinsic evidence, such as bargaining history, to determine the parties' intentions. *Id.*; *see Int'l Longshore & Warehouse Union v. NLRB*, 978 F.3d 625, 642 (9th Cir. 2020) (NLRB "erred [in interpreting a CBA] by consulting extrinsic evidence without first providing a legitimate basis for finding any of the relevant terms ambiguous.").

Here, Article 8 of the PLA unambiguously requires the refinery Owner to participate in the grievance procedure. Therefore, the arbitration clause should be enforced against Defendants without further delay. Even if the Court were to consider Defendants' proffered bargaining history (which it should not because Article 8 is not ambiguous), that bargaining history is entirely consistent with the Union's reading of Article 8.

First, the plain language of Article 8 establishes that the Owner is required to arbitrate grievances filed against it. Section 8.1 provides that "any question arising out of and during the term

of this Agreement involving its interpretation and application (other than jurisdictional disputes) shall be considered a grievance." *See* PLA §8.1. This clause could not be broader, as it applies to "any question" involving the PLA's interpretation and application. *See, e.g.*, *U.S. ex rel. Barajas v. United States*, 258 F.3d 1004, 1011 (9th Cir. 2001) ("The term 'any' is generally used to indicate lack of restrictions or limitations on the term modified."). Crucially, no express language in Article 8 *excludes* the Owner from the grievance procedure, which is plainly broad enough to encompass grievances against the Owner. And it makes sense that Section 8.1 embraces grievances against the Owner, because the Owner has several important obligations under the PLA, particularly in connection with the award of Covered Work to appropriate contractors in Article 3.[1] The arbitration procedure in Article 8 thus provides a vehicle to enforce compliance with those obligations and to resolve "question[s] … involving [the] interpretation and application" of Articles 2 and 3.

Indeed, Section 8.7, which concerns the division of certain costs incurred during arbitration of grievances, confirms that grievances may be brought against the Owner. Section 8.7 states that "the Owner will not be responsible for any costs or expenses" of arbitration "*unless the grievance is against the Owner*." PLA §8.7 (emphasis added). This language would serve no purpose unless grievances can be brought "*against* the Owner"; in such instances, the Owner must arbitrate *and* pay its share of the costs of such arbitration.

The provisions of Article 8 demonstrate that all signatory unions and all employers, including the Owner, are bound by the arbitration procedures. Section 8.2 authorizes "[t]he Owner and other Employers, as well as the Unions," to file grievances. PLA §8.2. Section 8.2 can only be read to mean that the bargaining parties felt it necessary to expressly state that the Owner and contractors, and not just the unions, could file grievances under Article 8. *Compare Atkinson v. Sinclair Ref. Co.*, 370 U.S. 238 (1962) (no provision for submission of grievances by employer). Although Article 8 does not specifically name the parties that may be compelled to arbitrate if a

---

[1] *See, e.g.*, PLA §3.1 ("Owner … agree[s] that [it] will contract for the assignment, awarding or subcontracting of Covered Work … only to a person, firm, corporation or other entity that, at the time the contract is executed, has become a party to this Agreement"); PLA §3.2 ("Owner … agree[s] that [it] will subcontract for the performance of Covered Work only to a person, firm, corporation or other entity who is or becomes party to this Agreement").

grievance is filed against them, Defendants appear to concede that Article 8 requires *other* Employers to arbitrate grievances brought against them — a position that is impossible to square with Defendants' theory that grievances against the Owner are not arbitrable.

Second, not only does Article 8's plain language make clear that the Owner is bound by the grievance procedure, the PLA as a whole confirms this is the only correct reading of Article 8. The PLA's definition of "Employer" expressly includes the Owner:

> [A]ll project managers, construction managers, contractors, subcontractors or other persons or entities assigning, awarding or subcontracting Covered Work (as defined in Article 2), or authorizing another party to assign, award or subcontract Covered Work, or performing Covered Work (other than Owner) will be subject to this Agreement by executing Attachment A, the Employer Agreement to be Bound (all of whom, *including the Owner*, are individually and collectively referred to as "Employer," "Employers," "Contractor," or "Contractors.")

PLA §1.4 (emphasis added).

Defendants' argument that Section 8.2 distinguishes the Owner from other Employers in a manner that suggests the Owner is not similarly situated to all other Employers under the PLA with respect to the obligation to arbitrate, Opp. at 8, ignores many other PLA provisions that use identical language. *See, e.g.*, PLA §2.1.1 ("the Owner or other Employers" must assign fabrication work in a particular manner); *id*. §2.3.1 (work performed by supervisors of "Owner and each other Employer" is outside the scope of Covered Work); *id.* §§3.1-3.2 (setting forth requirements for the "Owner and each other Employer" in the award, assignment, or subcontracting of Covered Work); *id.* §3.3 (stating duties of "Owner and every other Employer" with respect to subcontracting); *id.* §5.5 (describing obligations of the "Owner and other Employers" to accept training certifications provided through union-affiliated apprenticeship programs). In each of these provisions, by expressly referring to the "Owner and other Employers," the bargaining parties underscored that the Owner — as an "Employer" under the PLA — has the same rights and duties as contractors, subcontractors, and other entities within the PLA's definition of "Employer." The Owner's obligations under Article 8 are no different.

Moreover, as is common in collective bargaining agreements, the PLA makes clear that the obligations of all Employers, including the Owner, to arbitrate disputes for alleged violations of the PLA are the *quid pro quo* for the signatory unions' promise not to strike during the PLA's term.

The Supreme Court has repeatedly affirmed that "a no-strike obligation … is the *quid pro quo* for an undertaking by the employer to submit grievance disputes to the process of arbitration." *Boys Mkts., Inc. v. Retail Clerks Union Local 770*, 398 U.S. 235, 248 (1970) (citing *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 455 (1957)); *see also Children's Hosp. Med. Ctr. v. Cal. Nurses Ass'n.*, 283 F.3d 1188, 1192 n.7 (9th Cir. 2002) (noting that "the doctrine of 'coterminous interpretation' requires that a general no-strike clause should be read only as broadly as the arbitration clause of the collective bargaining agreement, because 'a contractual commitment to submit disagreements to final and binding arbitration gives rise to an implied obligation not to strike over such disputes'"), quoting *Gateway Coal Co. v. United Mine Workers of Am.*, 414 U.S. 368, 381–82 (1974).

Indeed, that *quid pro quo* — arbitration of grievances in exchange for the unions' waiver of the right to engage in work stoppages — is explicit in this PLA. Section 6.1 forbids the unions from engaging in any "strikes, sympathy strikes, picketing, work stoppages, slowdowns, interference with the work or other disruptive activity" at the refinery during the PLA's term. PLA §6.1. "[A]ny party" to the PLA — which Defendants would undoubtedly agree includes the Owner — may demand expedited arbitration to determine whether a union has engaged in a strike in breach of Article 6. PLA §6.6. A union may not defend on the ground that its strike was justified by another party's violation of the PLA; to the contrary, "[d]isputes alleging violation of any other provision of this Agreement, including any underlying disputes alleged to be in justification, explanation or mitigation of any violation of [Article 6], *shall be resolved under the grievance procedures of Article 8*." PLA §6.7 (emphasis added). In other words, Article 8's grievance procedure is the sole vehicle for unions to resolve disputes regarding violations of the PLA. Just as the unions give up their right to strike in exchange for the ability to arbitrate disputes, their counterparts who benefit from the no-strike restriction — including the Owner — are necessarily bound by Article 8 in order for that mechanism to be effective.

Defendants strain to manufacture some ambiguity in Article 8 by emphasizing language that gives the Owner a supervisory or monitoring role with respect to PLA grievances between unions and *other* Employers performing work under the PLA (i.e. the Owner's contractors and subcontractors). *See* Opp. at 8-11. Sections 8.4 (which entitles the Owner to notice of any requests

for arbitration) and 8.9 (which allows the Owner to participate voluntarily in arbitrations involving other parties) do give the Owner such a role. This role makes sense, given the Owner's interest in the resolution of disputes concerning work performed on its property, particularly considering that all of the other Employers working under the PLA are contractors or subcontractors of the Owner. But nothing about the provisions that give the Owner this *additional* role with respect to disputes between other Employers and the unions suggests that the Owner is not *also* bound to arbitrate grievances brought directly against *it* for breaches of its own obligations under the PLA.

Article 8 broadly covers "any question arising out of" the PLA, and there is no exclusion of grievances against the Owner from the duty to arbitrate. Because there is no ambiguity regarding the Owner's obligation to arbitrate grievances against it under Article 8, the Court should not consider Defendants' proffered bargaining history contained in the Declaration of Shenna Bradshaw. *Am. Fed'n of Musicians*, 903 F.3d at 977; *see also Int'l Longshore*, 978 F.3d at 641-42 (where CBA language is unambiguous "the parties' negotiations, post-agreement conduct, and industry customs bear no relevance to its meaning," and NLRB "erred by consulting extrinsic evidence"). But even if the Court were to consider that additional evidence, Defendants' account of the bargaining history is entirely consistent with the reading of Article 8 that the Owner is bound to arbitrate grievances against it.

Ms. Bradshaw states that she participated in the negotiations on behalf of Tesoro that resulted in the PLA. Dkt. 35 (Bradshaw Decl.), ¶3. In those negotiations, she avers that she "explained to the [Building Trades Councils] that Defendant, as the Owner, did not want to be involved in any disputes *with the individual subcontractors signatory to the PLA and the [Building Trades Councils]*," *id.*, ¶5 (emphasis added); and, in response to Tesoro's stated concern, the parties "agreed to add the following language in Section 8.9: 'Any party to a grievance may invite the Owner to participate in resolution of a grievance. The Owner may, it [*sic*] its own initiative, participate in Steps 1 through 3 of the grievance procedure,'" *id.*, ¶6. The language of Section 8.9 is entirely consistent with Ms. Bradshaw's account of Tesoro's stated concern. Under Section 8.9, Tesoro could monitor ongoing disputes between unions and *other* Employers (i.e. the contractors

6
REPLY ISO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; CASE NO. 3:22-cv-09057-AGT

and subcontractors hired by the Owner to perform work on the refinery), and even participate in those grievances if the Owner chose to, but the Owner was not required to do so.

Equally consistent with Ms. Bradshaw's account is Section 8.7, which clarifies that the Owner will not be responsible for costs in connection with any arbitration "regardless of whether the Owner participates in the resolution of a grievance … *unless the grievance is against the Owner*." PLA §8.7 (emphasis added). That language makes clear that if the Owner *chooses* to involve itself in a grievance between a union and a contractor or subcontractor, the Owner is not responsible for the costs of the arbitration. However, where the grievance is brought *against* the Owner, arising out of the Owner's alleged violation of its *own* obligations under the PLA, Section 8.7 clearly envisions that the Owner can be compelled to arbitrate and pay its share of the costs of the proceeding.[2]

## II. Defendants Ask the Court to Resolve Issues Reserved for the Arbitrator

Defendants also argue that they cannot be compelled to arbitrate the Union's grievance because they believe the work claimed by the Union falls within one of the exclusions from Covered Work set forth in Section 2.3. *See* Opp. at 11-17. Specifically, Defendants contend that the work falls within the exclusions for "quality assurance/quality control" work in Section 2.3.9 or work by a

---

[2] Defendants cannot use Ms. Bradshaw's declaration to fabricate ambiguity as to whether the Owner is required to arbitrate grievances brought directly against it for breaching its own obligations under the PLA. Ms. Bradshaw avers that she "told the Union that Defendant did not want to be obligated to participate in *any* grievance or arbitration procedure," Bradshaw Decl. ¶6 (emphasis added), but she identifies no language in Article 8 reflecting that the unions *agreed* to Tesoro's position — and there is none. Extrinsic evidence is relevant only to the extent it sheds light on the parties' *mutual* intent, not *one* side's intent. *See Am. Fed'n of Musicians*, 903 F.3d at 977; *Headlands Rsrv., LLC v. Ctr. For Nat. Lands Mgmt.*, 523 F.Supp.2d 1113, 1123 (C.D. Cal. 2007) ("When discerning the mutual intent of the parties, a court must take care not to substitute one party's view of what the contract should have said for the terms that are actually contained within the document.").

Ms. Bradshaw tries to create the impression that the parties agreed that Tesoro would be immunized from grievances altogether by stating that she "recall[s] writing in [her] notes that Section [*sic*] 8 does not apply to the Owner." Bradshaw Decl. ¶6. But that is not evidence of what the parties agreed to, particularly in light of the PLA's unambiguous language to the contrary. Indeed, Ms. Bradshaw's statement about what she recalls writing down is not evidence of anything at all given Defendants' failure to submit her notes. *See United States v. Bennett*, 363 F.3d 947, 953 (9th Cir. 2004) (when a document's "contents are sought to be proved," the "proponent must produce the original … or explain its absence"), citing Fed. R. Evid. 1002, 1004; *see also* Plaintiff's Objection to Evidence Filed with Defendant's Opposition to Summary Judgment, filed herewith. Defendants fail to show by admissible evidence that extrinsic evidence supports their interpretation of Article 8. *See* Fed. R. Civ. P. 56(c); *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.").

"specialty contractor[]" in Section 2.3.5. These defenses ask the Court to step into the role of the arbitrator in interpreting the PLA, contrary to clear precedent that it is "not [the courts'] function to review the merits of the grievance." *Winery, Distillery & Allied Workers Union, Local 186 v. E & J Gallo Winery, Inc.*, 857 F.2d 1353, 1356 (9th Cir. 1988). Instead, "[i]nterpretation of substantive provisions must be left to the arbitrator in the first instance." *Laborers Int'l Union Local 252 v. Town Concrete Pipe of Wash., Inc.*, 680 F.2d 1284, 1285 (9th Cir.), *cert. denied*, 459 U.S. 1039 (1982).

Because of the strong presumption in favor of arbitrating grievances arising under a collective bargaining agreement, the Court need only determine that the arbitration clause is "readily susceptible" to an interpretation that it covers the contract violations in question, and that "there is no language in the CBA that expressly excludes from arbitration" the substantive provisions at issue. *United Food & Com. Workers Union, Loc. 770 v. Geldin Meat Co.*, 13 F.3d 1365, 1368-69 (9th Cir. 1994). In such instances, the Court must compel arbitration. *Id.* at 1370. Any "further inquiry would require [a court] to delve into an area of contract interpretation which the Supreme Court has clearly mandated as the arbitrator's realm." *Id.* at 1368. A reviewing court need only examine the "relevant substantive provisions to see whether they contain *exceptions to arbitration*." *Westinghouse Hanford Co. v. Hanford Atomic Metal Trades Council*, 940 F.2d 513, 520 (9th Cir. 1991). In the absence of any language expressly excluding a particular dispute from arbitration, the dispute is arbitrable and "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *Warrior & Gulf*, 363 U.S. at 585.

Here, the PLA contains no exclusion that would prevent the arbitration of a subcontracting grievance about the scope of the PLA's definition of Covered Work. Section 8.1 of the PLA excludes only two kinds of disputes from arbitration: "jurisdictional disputes," which are handled through the procedure in Article 9, and grievances "between or among parties signatory to a Master Agreement [i.e., a local union collective bargaining agreement that is incorporated into the PLA, *see* PLA §§1.5, 3.2] arising out of or involving the interpretation of a Master Agreement," which are handled "under the grievance procedure provided in that Master Agreement." PLA §8.1. By

contrast, there is no language in Article 8 or in the PLA's subcontracting provisions that purports to exclude disputes regarding violations of the subcontracting requirements. *See* PLA Article 3.

Nor can Defendants point to any evidence, much less "the most forceful evidence," of the parties' intent to exclude from arbitration a dispute regarding the scope of the definition of Covered Work. Instead, Defendants merely invite this Court to assume the role of the arbitrator by asking it to decide the merits of the underlying grievance. Defendants argue that the work is not "Covered Work" because it falls under one of two contractual exclusions: for "quality assurance/quality control" work, as excluded in Section 2.3.9, and work involving "specialty contractors," which is subject to the Owner's "reasonable exercise of discretion" under Section 2.3.5 when "there is no qualified Union signatory contractor available to perform the work" (and other conditions are satisfied). Opp. at 12-14.[3] But the question whether one of these exclusions from "Covered Work" applies is exactly the question to be decided in the underlying grievance, which concerns (as §8.1 provides) "interpretation and application" of those provisions and the subcontracting provisions in Article 3 of PLA.

To decide whether the work at issue is "Covered Work," which Article 3 requires to be subcontracted only to contractors who agree to become bound to the PLA, the Court would have to interpret the language of the PLA to determine the meaning of disputed PLA terms, such as what constitutes "quality assurance/quality control," what is a "specialty contractor," what it means for a signatory contractor to be "available to perform the work," and when the Owner's exercise of discretion was "reasonable." Only then would the facts of Local 3's grievance enter the analysis, as the Court would have to consider whether the Union's grievance actually falls within one of those exceptions.[4] Defendants dwell at length on their account of the facts of the Union's grievance and

---

[3] The exclusion from "Covered Work" in Section 2.3.5 provides in full, "Work by specialty contractors, if, as of the effective date of this Agreement, there is no qualified union signatory contractor available to perform the work. At the first JAC meeting of 2019 and each calendar year thereafter, the Owner and Union shall determine by mutual agreement whether there are qualified Union signatory contractors available to perform the work described in Section 2.3.5. In making this determination, the Owner and Union will evaluate union signatory contractors on criteria that include but are not limited to the Owner's standards for safety, quality and resourcing. The Owner's determination, based on its reasonable exercise of discretion, shall be controlling."

[4] The factual issue here is entirely unlike that in *Northern California Newspaper Guild Local 52 v. Sacramento Union*, 856 F.2d 1381 (9th Cir. 1988), on which Defendant relies. The dispute in

9
REPLY ISO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; CASE NO. 3:22-cv-09057-AGT

how those facts – in their view – show that the work in dispute is not Covered Work. But the Court need not wade into that dispute, because consideration of how the Covered Work exclusions might apply to the facts of the grievance is entirely intertwined with the merits of the Union's grievance, and is therefore a task for the arbitrator. *See, e.g.*, *Geldin Meat*, 13 F.3d at 1369 & n.5 (discussing principles of arbitral interpretation that apply to labor contracts and holding that "it is up to the arbitrator, not the District Court, to apply principles of contract law in interpreting the CBA"); *E & J Gallo Winery*, 857 F.2d at 1356 (noting that "the arbitrator must decide in the first instance" whether an exclusion applies so that the employer does not have "unfettered discretion" to characterize any action as falling under that exclusion); *United Steelworkers v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960) ("The courts … have no business … determining whether there is particular language in the written instrument which will support the claim.").[5]

---

*Sacramento Union* concerned whether a collective bargaining agreement was in effect at the time of the conduct giving rise to the union's grievance. If there was no collective bargaining agreement in effect, then there was no enforceable agreement to arbitrate. As such, arbitrability turned on the factual question, appropriately resolved by the court, of whether there was an arbitration clause in effect that could apply to the dispute. 856 F.2d at 1383-84. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010) is distinguishable on identical grounds; there, the factual issue to be addressed by a court concerned whether a collective bargaining agreement was in effect at all at the time of the dispute. *Id.* at 307. Here, by contrast, there is no dispute that the PLA was in effect at the time of the parties' dispute to which all parties were bound. *See* Opp. at 2 (conceding that work on the refinery is subject to the PLA); Dkt. 17 ("Answer") at ¶1 ("Defendants admit they are parties to the PLA that applies to the Marathon refinery facility in Contra Costa, California."). The primary dispute in this case concerns the meaning of specific terms of that agreement and the factual issues concerning the application of those contract terms to the types of work in dispute.

[5] Defendants' contention that compelling it to arbitrate this grievance would "read out the word 'discretion' from [Section 2.3.5]" (Opp. at 1, 16) is indistinguishable from the argument rejected by the Ninth Circuit in *E & J Gallo Winery* that an employer had the sole authority to determine when strikers' conduct was violent such that the employer's termination decisions would not be subject to arbitration. In that case, an "amnesty clause" expressly prohibited arbitration of grievances for strikers who were terminated for "acts of violence." 857 F.2d at 1355. As the court explained, "By its very terms, the clause applies only when strike misconduct was violent. As the Union correctly points out, this provision does not alter in any way the right of an employee who did not engage in 'acts of violence' … to challenge his discharge as unjust … . Nothing in the Amnesty Clause unambiguously confers upon the Wineries the exclusive right to determine if the triggering event in fact occurred. … The Wineries argue in substance that allowing the arbitrator to determine when violent misconduct occurs renders meaningless the Amnesty Clause. We disagree. *The employers' right to unquestioned discretion in disciplining a striker will not be disturbed when the Union agrees that the misconduct was in fact violent. But in this instance, the Union denies that the conduct was violent. It is not our function to review the merits of the grievance.*" *Id.* at 1356 (emphasis added). Likewise here, the Owner's "discretion" to assign work by specialty contractors under Section 2.3.5

Because "any question arising out of and during the term of this Agreement involving its interpretation and application" is properly decided through the grievance procedure and, if necessary, arbitration, such questions are explicitly reserved for the arbitrator. PLA §8.1. Asking this Court to answer those questions would cause it to become "entangled in the construction of the substantive provisions of a labor agreement." *Warrior & Gulf*, 363 U.S. at 583-85 ("Whether contracting out in the present case violated the agreement is the question. It is a question for the arbiter, not for the courts."). Therefore, such questions are inappropriate for judicial resolution.

## CONCLUSION

For the foregoing reasons, Local 3's Motion for Summary Judgment should be granted and Defendants should be compelled to arbitrate Local 3's grievance in accordance with Article 8 of the PLA.

Date: April 14, 2023

Respectfully submitted,

ALTSHULER BERZON LLP

 /s/ Eileen B. Goldsmith
EILEEN B. GOLDSMITH
ZOE PALITZ
SAMUEL HULL

Attorneys for Plaintiff International Union
of Operating Engineers, Local 3

---

comes into play, and the Owner's discretion prevails, *only* once it is determined that the work at issue is not Covered Work. Whether the work in dispute is excluded from Covered Work requires interpretation of Sections 2.1, 2.3.5, and 2.3.9, and therefore must be decided by an arbitrator.